All right, our fourth case for this morning is United States v. Ronald Coleman and Mr. Good morning, Riders. May it please the court, counsel? This case involves the indictment on obstruction of justice of the Chicago Police Officer Ronald Coleman. There are specifically four issues raised in our brief, but two that I want to talk to this court about. And that's related to the denial of my client's six-minute right to a fair trial. Two points, the first two raised in the brief, are related to statements made in the course of one of the, I guess it would probably be the primary witness in the government's case, which is La'Ron Conway. One of the things that the government elicited by its own prodding, there hadn't been any testimony earlier on to suggest it, was whether or not the reason why La'Ron Conway lied to the federal investigators earlier on was because he was in fear of something. There hadn't been any evidence at all elicited by La'Ron Conway about that. I certainly understand in the case law talks about that being fearful would be the type of thing perhaps that may offer an explanation for an individual lying to federal investigators. However, in this particular case, Mr. Conway testified to it specifically, and before the government offered that to him, was that he was trying to protect people he considered friends. Conway Davis. In this particular case, that would have been sufficient and would have sufficed for purposes of offering an explanation for why he lied to federal investigators. However, then the government offers to Mr. Conway effectively the taint of that Chicago police are bad, that there's some danger associated with it. Well, you're talking, I assume, about this, you put it on page 35, the question, were you afraid for your family? I was. In what way? And then mentions that he's a police officer. And then, Mr. Needham objects to the relevance, and the court overrules the objection. So the reason I'm asking the question I'm asking right now is to find out what our standard of review is. The only thing the court's alerted to is a relevance objection, and the court can see why it might be relevant. You're really arguing something much bigger than relevance at this point. I am, Your Honor. So isn't it plain error review? And that's why I include that in my brief, is to the extent that in order for me to make this argument, it is something other than relevance that needs to be objected to, then it is a plain error review. And the problem is on plain error review, among other things, even if we thought it was an error, we would need to look at the impact it had on the proceedings as a whole. It's not something that's belabored. There is quite a bit of other evidence. It really boils down to one thing. What does the jury think was said during that minute and six seconds, or whatever the phone call was? They decided firstly to your client. Police are bad guys, I guess, is maybe your theory. We don't know what the effect that had on the jury, and that's probably the biggest concern that we have here, is that for all we know, that taint could not have been set aside. That bell could not have been unrung. And I was talking earlier about all of the testimony that had preceded that conversation, or that statement that was elicited by the government, and contained on pages 13 and 14 of the government's brief, is all of the Maybe one way to characterize the evidence in this case is that it's closely balanced. And when it's closely balanced the way it is, where the only thing tying defendant Coleman, arguably to a statement that then Conway made to Davis, is merely his own testimony. And the suggestion within Conway's own testimony that he was scared, the jury could infer that maybe there's something that we're not going to hear about. Maybe there's something that Conway knew about that he's not testifying about. And that's an enormous concern for a defendant who is only able to respond to the evidence that's before him, put on the best case that they possibly can. And so that's why we believe in the context of You did move, there was a motion for a new trial, but there was no motion right at that moment for a mistrial, right? I agree. That's correct, Your Honor. I mean, if he's all that afraid, I don't know how that would cut, actually. And again, on plain error, it's hard to do this. But if we think Conway is afraid of Coleman, is that going to induce him to testify unfavorably to Coleman? Or is that going to induce him to testify favorably? Well, I think in the context of a grant of immunity to testify against Coleman, that that does cut against the quality or the veracity of that testimony. But there's a lot of cross-examination about that, that he's under the grant of immunity, that he's a bad person himself. Sure, and I understand that. And Mr. Needham, the trial counsel in that case, could not have, without further exacerbating the taint of the criminality or potential criminality or the concern or the fear, had he explored that particular area, that would have done no service to his client. That would have been a disservice to raise and re-review and give Conway an opportunity to explain away this government-elicited testimony. And so I want to go to the second part, which is the argument that we make that the government, when it was questioning Mr. Conway, was asking him questions about something that it already knew and held to be true, because there was no evidence at all that there was a person that contacted Mr. Conway before he communicated. This is the mysterious woman calling Conway and saying, you've got a call that prompts the Conway-Coleman call. Allegedly prompts that call, yes. Does it matter that much how that call is prompted? We know that there is a Conway-Coleman call. We don't know, you know, there's no recording of what's said in that call, but we also know a fair amount about the aftermath of that call because of wiretaps that were in operation. And we know about the effort to move the drugs. Why is it so crucial that we nail down whether it was some mystery woman calling on his work line or whether he's misremembered about his cell phone? Why does it matter? Well, the concern as it relates to this particular line of testimony, and if I can dial it back, there's the initial testimony about what do the records indicate. And the records of his cell phone, there's no such call. Right, and in fact, Conway then testifies about how he's confronted with the records and the records don't indicate that. But then the government asks him and follows up on this very line of questioning to supposedly explain why he's then communicating with Coleman. Now, Your Honor talked about what happened as a result of this. Well, I'm just trying to say the core of this case is about whether Coleman was correctly convicted for obstructing justice and attempting to tip off the targets of this investigation. So it's that phone call. And you're focusing on what led up to that phone call. And I'm just saying the phone call stands in context. A, it was made, and B, we know what happened afterwards. And so I'm trying to figure out what would change if we had a good explanation for Conway's decision to place the call, no explanation, a bad explanation. Why is that so central? Well, I want to get back to Your Honor's statement about what followed. So what we know from the records and we know from Conway's testimony is that he then reached out to Davis after. Right. We don't know, with the exception of the fact that Conway testified to that, that that's in fact what happened. What we know is that there was a communication between Conway and Coleman. Coleman testified that the reason for that conversation was to discuss a get-together that was going on the upcoming Sunday for Father's Day. And so Conway is the only person that then is the person who's trying to tie what happened with the conversation with Coleman to his conversation with Davis. Now, why does that matter? Well, it matters because, again, the credibility of Conway is of paramount importance in this case. And so we've got the issue related to his supposed fear of Coleman. But then we have this issue with him saying that right after I talked to him, and because I talked to him, I'm reaching out to Davis. But then Davis, isn't he recorded as saying that the warning came from Comey on the task force? And who else would that be? I don't know. There is no evidence in this case that every other person that existed on the task force had been discussed and vetted and couldn't have known any relationship with anybody else. And all that's important. But we do know that there were prior high school attendants together playing basketball between Coleman and some members. Absolutely, Your Honor. And in fact, Coleman fronted that and said, as to two people that he knew were then targets, he's like, I know people that are the subject of this. And that didn't, in and of itself, cause anybody in the task force to say, let's set him aside, let's brick him. The only time that it mattered was when they went to execute the arrest warrants, that they didn't want him to be in contact with someone who was going to be- Send him over to Indiana, right. Right. Right, because for his own benefit of not people knowing that he was involved. But beyond that, they knew he was aware of people that were being investigated. And that wasn't a concern. But the record is absent of the fact of whether or not there was anybody else that was on the task force that may have known or did in fact know any of these people. That's the problem with the Chicago police is that a lot of them grew up in the neighborhoods. And so they know people that are subject of federal investigations and state investigations and things like that. So the fact that Coleman may have had a relationship with Davis and Conway, it was certainly remote in the sense that there is very limited communications between them. I think everybody testified to that. And so all of this plays and is important because the idea that Ronald Coleman, who has no prior problems of any kind, is going to reach out to somebody whom he knows for the sole purpose of letting someone else who he barely knows and hasn't communicated with so that he can alert them to an investigation, to warrants being served. It matters so much the credibility of the person who is the only person that is tying that to him. And so that's why as to these two particular arguments, it's so important. And we believe whether individually or collectively, the statements, the government elicited statements and then the failure to correct the patently false testimony in that moment that was being made by Conway about whether or not, what was the catalyst for a conversation with Conway matters. And it denied him the Sixth Amendment right. OK. I think you are into your rebuttal time. OK. So we'll hear from you later. Thank you. Ms. Wells? Good morning. And may it please the Court. Melody Wells for the United States. The District Court did not abuse its discretion or commit plain error in permitting a brief colloquy with the government's witness, Laron Conway, in which he acknowledged his prior inconsistent statements to the FBI and provided a very brief explanation as to why he did that. In particular here, this testimony was plainly relevant. Conway's credibility was at issue throughout the trial. As Your Honor has noted, he was cross-examined extensively about his credibility. And on summation, defense counsel argued quite forcefully to the jury that Conway shouldn't be trusted, that he was a liar, et cetera. But this popping out with, you know, you're afraid for your family, we know what the Chicago police do, surely out of bounds. Well, Your Honor, as I read the record, the way that that testimony comes in is that the government asks initial questions establishing the fact that Conway was not initially truthful. And in the follow-up to that, he acknowledges that he was not. And he's asked, why weren't you completely truthful? He first says, well, I was trying to protect myself. I was trying to protect some people. I was scared. And then the follow-up question is, what people were you trying to protect? He identifies Dewont Davis as cousin, Ronald Coleman, who was an old acquaintance from high school. And only at the tail end of that colloquy do we get the question that we're now seeing the objection to, though, were you afraid for your family? That falls sort of as a subset to this larger category of testimony. It's closing out the issue. But you didn't really need it. I mean, you didn't have to, like, pump out, you know, yes, I'm afraid for my family because Chicago police officers are vindictive. It seems you already had on the record a great number of reasons why Conway may have lied first and then changed his story. Your Honor, as I read the record, I think it was just closing out this issue. Certainly, there's a counterfactual where those questions weren't asked. But I think given the brevity of the testimony here and the fact that it was not revisited and the fact that there was no objection, not in real time, not later at sidebar. There was no request for an instruction to disregard it. And it wasn't expressly raised on post-trial briefing either suggests that it really wasn't such a significant event. And it reads, I think, in the course of 70-plus pages of testimony from Conway as a bit more of a blip. Relatedly, on the issue of this testimony, I do just want to raise one other thing, which is plainly that the jury was entitled to some information about why he was initially giving those inconsistent statements. Historically, the jury has been entitled to consider and assess all of the factors that relate to a witness's credibility. And I think throughout the course of the trial, this information was likely to come out in some form or fashion in any event. So the government's running it, yeah. So what about this phone call? It is a little disturbing because you would have thought that if Coleman was trying to protect the people running this big drug operation, he would have been the initiator of the call to somebody, to Conway, to someone, let's say to Conway. But he's not. It's out of the blue. And the records, Conway seems to be clear that he got the call on his personal phone, but the personal phone records don't show that. Two things, Your Honor. There's no dispute here that the call between Coleman and Conway in which Coleman disclosed the facts of this ongoing investigation and told Conway to warn his cousin Davis that they were going to search 10 to 12 houses, cut it out, clean it up, et cetera. There's no dispute that that all happened on a phone call that was made by Conway to Coleman. Right. That's right. However, I don't think – And so why is Conway doing that, and doesn't that make the whole story sound a little strange? I don't – the record – the testimony in the record as to why Conway does that is that he was contacted while he was at work by telephone by an unknown woman. The testimony does not specify that he was contacted on his cell phone, and we also agree and acknowledge, and this was all admitted at trial, that that phone call from the unknown woman is not on his cell phone records. Right. As the government suggested at trial, it's possible that that call came in on the school telephone where Conway worked. Was there any evidence that there were other burner phones floating around or any other telephone calls? There's nothing like that in the record. However, I do think, and Your Honor touched on this earlier, that it ultimately doesn't matter that much what triggered that contact between Coleman and Conway, who called who, or what the catalyst for it was, because what matters in this case is what happened on that phone call. There's no dispute that that phone call took place, and all of the very well corroborated evidence at trial, including Conway's testimony, Davis' testimony, and the intercepted phone calls, show that this message from Coleman, 10 to 12 houses are going to be searched, cut it out, clean it up, I don't want to see Dwan Davis in one of these houses where we can do the searches, all of that traveled from person to person and is well documented and corroborated across all of the government's evidence at trial. And so as a result... And even to the point of Benfield getting tailed to moving this stuff to a new house that you didn't know about? That's absolutely right. The second house where the contraband was moved to was not on the list of homes or residences or premises that were going to be searched initially. They saw garbage bags being hauled out of the Spalding house, brought by car to the South Christiana house, and when they executed the search there, found a number of weapons, a substantial amount of heroin, and everything you would need to sell those drugs on the street. So to circle back to your question, I don't think that the trigger here as to why they got in touch ultimately affected the judgment of the jury. There's no evidence to suggest that it would have. Unless there are any further questions, we simply ask that the court affirm the sentence and the conviction in this case. All right. Thank you very much. Anything further, Mr. Sandberg? So I'm not sure that it's as clear as counsel wants it to sound that a conversation, an apparently unelicited conversation from Conway to Coleman necessarily, in and of itself, explains away why there was later conversation between Conway and Davis. One can imagine any number of circumstances where, based on the way the conversation or communications go from the agents to Conway, saying, Who is this? Whose number is this? He's an officer, a police officer. And then using that type of information that he is then on the task force that they would have known at that point in time to try to explain away. I don't know whether that's true or not true because they don't go into detail about the specifics of the conversations that took place between Conway and the agent. And there's no, it's not recorded, it's not a call way that we can look line by line. However, that is at least an explanation, another explanation as to why it's so important that this testimony and the manner in which it was elicited, we just think that it was a denial of his fair trial in the Sixth Amendment and we request that this matter be vacated sentence and conviction and sent back for a new trial. And if they've got the evidence, they'll be able to demonstrate it. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.